## Case No. 4,425.

ELWELL v. MARTIN et al.

[1 Ware (53) 45;[1] 3 Wheeler, Cr. Cas. 11.]

District Court, D. Maine. July 28, 1824.

C. S. Daveis, for libellant.

Fessenden & Deblois, for respondents.

WARE, District Judge. The examination of the witnesses having been brought to a close, a motion is now made to dismiss the libel as to Storer, one of the respondents, for the purpose of introducing him as a witness for the other two. The motion is supported on the ground that there is no sufficient evidence to charge him as a joint trespasser. The counsel for the respondents resists the motion, because, as he contends, there is sufficient evidence to charge him, and if there be not, he is so connected with the trespass that it is impossible to decide on the present motion without going into a consideration of the whole case. Of the right of the court to grant this motion, provided a proper case is made out, I do not profess to feel a doubt. No precedent is indeed cited, and none is now recollected, in point. But the principle itself, as a rule of practice, stands on too strong grounds of reason and good sense to require a precedent to lean upon. If the practice of the court would not admit of it, the libellant would always have the power of practising the greatest injustice. All that would be necessary would be to join in his libel every person acquainted with the transaction, who, he was not assured would testify in his favor; and it would thus, in a small ship's crew, be the easiest of all things, to shut out any obnoxious witness. The worst which the libellant would have to fear would be that he might be amerced in costs.

The material question is whether the present is a proper case for the interposition of the court in this way. Though the admiralty reports furnish no light on the question, as to the practice of these courts, the practice of the courts of common law, in analogous cases, appears to be well settled. If a person is made a defendant, against whom there is no evidence, he is entitled to his discharge as soon as the opposite party has closed his case, and may then be introduced as a witness. But if there be any evidence against him, even the slightest, the court will not undertake to decide on the effect of the evidence, but the whole case must go to the jury together. Bull. N. P. 234; Phil. Ev. 61; Peake, Ev. 159. In a recent case at nisi prius it was holden that in a case of tort, if there be no evidence against one of the defendants, it is in the discretion of the judge whether he will direct an acquittal of him for the purpose of his being introduced as a witness. The other defendants cannot claim his discharge, as a matter of right. Davis v. Living, 1 Holt, N. P. 275.

---

[1] [Reported by Hon. Ashur Ware, District Judge.]

If the strict principles adopted by the common law courts are to be followed in the practice of the admiralty, the facts in the present case will most clearly not warrant a dismissal of the libel against this respondent, at this stage of the proceedings. That testimony has been produced which may go to charge this respondent, is admitted by the whole argument. He was certainly a party to the assault when the principal injury might have been and probably was received. It is, however, readily conceded, that on applications of this kind to the discretion of the court, a court of admiralty may properly allow a greater liberality of practice than is admitted in a court of common law. In the admiralty, the whole case, both of law and fact, is submitted to the decision of the court. If there be some evidence which may go to charge one of the respondents, but which, in the opinion of the court, is competent to decide this fact, it is sufficient, I see no good reason why the libel may not be dismissed as to him, for the purpose of introducing him as a witness, when the ends of justice require it. The sensible reason, which precludes a court of common law from doing it, seems to be this, that by its constitution it is rendered incompetent to decide on the weight and value of testimony, and it is the right of parties to have their questions referred to the decision of a jury. The decision of the court would then be a trenching on the province of the jury. In the admiralty, this objection does not exist.

It is argued in support of the motion that, though there is evidence which may tend to inculpate this respondent, yet its sufficiency in point of fact is not admitted, that it presses on him with much less force than on either of the others, and as the parties are severally, as well as jointly, liable for the whole damage, no injury can possibly accrue by allowing the motion, to the libellant, a sufficient stipulation having been filed by the master to cover all the damages that can in any event be decreed. The argument, as addressed to the discretion of the court, would be entitled to great consideration, if no witnesses had been adduced on the part of the respondents. If all the ship's crew had testified on the part of the libellant, I think it would have been the duty of the court to go far to sustain this motion, particularly if there were appearances of prejudice or ill-will on the part of the witnesses against the officers. Such, however, is not the present case. Two witnesses have been called on each side. The officers appear to have had their friends as well as the libellant. Both sides of the story have been told, and the application now is to extricate from the case one of the parties to the tort, to enable him to tell his story. The testimony of a witness standing in such a situation, is in all cases to be received with great caution, and often with many grains of allowance. When exonerated from his legal liability he will carry with him to the stand the feelings and prejudices of a party, and as he stands at present excluded by the rules of law, and the purposes of justice do not seem in this case to require his testimony, the motion must be overruled.

July 28th. After the interlocutory motion was disposed of, the case was elaborately argued by the same counsel, on the merits. The facts of the case are fully stated in the opinion of the court.

WARE, District Judge. This is a libel for an assault and battery, brought by Elwell, one of the crew of the brig Mentor, against Martin, the master, and Storer and Fales, the two mates. Elwell complains against the respondents that, on the 25th of June last, they jointly made an assault upon him with great violence, and inflicted, among other injuries, the very serious one of dislocating his left shoulder. To this libel, the respondents have put in several answers, admitting and justifying the assault as necessary and proper correction to punish the mutinous and disobedient conduct of the libellant, and denying that the dislocation of the arm was the effect of the assault. Elwell, in his replication, reaffirms the matters stated in his libel, with considerable amplification, and denies the sufficiency of the justification. The cause has been very fully and ably argued on both sides, and now stands for decision.

Four of the ship's crew have been examined in the case, two called by the libellant, and two by the respondents. In the principal facts there is among the witnesses a substantial agreement; but in a variety of circumstances there are considerable differences in their representations. The affair which gave occasion to this prosecution, took place at Turk's Island, after the brig was loaded, and was in the act of departing from the port. The captain had been on shore in the boat, to clear out his vessel, and took with him as boatmen, the libellant and John Martin, another of the crew. While he was on shore, Elwell left the boat, and meeting the crew of a vessel that had been wrecked, he went into a shop and drank with them. In returning he met Martin, his companion, and drank with him again, so that on his arrival at the boat he is alleged by the captain to have been so much intoxicated that he was obliged to employ another hand as oarsman. This intoxication, however, was not to such a degree but that he assisted in dragging the boat off, which had been drawn up on the beach, in doing which, as he alleges in his replication, and as he complained at the time, he cut his foot with a shell, so that he could not row without pain; and it turns out in evidence that the hand employed by the captain was a black servant who came off in the boat with a gentleman who was going with the captain on

board the vessel. When the boat arrived, Elwell also went aloft and loosed one of the top-gallant sails. The vessel was already under way, backing and filling, to await the arrival of the captain. The crew then went to dinner. While at dinner, the cook, who is one of the witnesses, was sent aft for the customary allowance of grog. On his return, he told them that they must go themselves for it, but that Elwell had better not go, as he would not get any. One of the other witnesses also advised him not to go, as he had already drank full enough. Elwell, however, answered with an oath, that he would have his grog; and as he went with the others and demanded it of Fales, one of the respondents, said that he would cut the throat of any one that touched him. Fales refused to deliver it, and Elwell persevered in his demand. Fales ordered him forward, and took a piece of board or plank and struck him. Elwell came aft with an open knife in his hand, with which he was eating his dinner, and during this time he appears to have been brandishing it about, probably in a threatening manner, but without any apparent intention of striking Fales, who stood below and beyond his reach. When Fales took his stick and struck him, Elwell closed his knife and put it away, grasped the stick which Fales had in his hand, and wrenched it from him, and threw it on deck. He then dared Fales to come on deck, and declared that he would hide him. Fales was not slow to accept the challenge, but immediately came up and recovered the stick which had been wrenched from his hands, and again brandished it at Elwell, and probably struck him. They then clenched, and a scuffle ensued. This part of the affray is related with circumstances of difference by the witnesses, some of them saying that they immediately clenched, when Fales first came up, and that he then disengaged himself from Elwell, took up the stick and struck at him, and that afterwards they clenched a second time. During the scuffle, Storer, the first mate, came up and parted the combatants, gave Elwell a shove on the shoulder, and ordered him forward. Elwell, with an oath, refused to go until he had his grog. While Storer was pushing him forward, the captain came on deck, and asked if there was mutiny. One of the officers replied that it looked like it. He then ordered Elwell forward, and accompanied his order with a kick on the back. This was twice repeated in quick succession, the captain sustaining his body by his hands hold of the rigging, and planting both feet on the back of the libellant, the two first times lightly, the third with such force as to throw Elwell several feet forward, and prostrate him on his face or side, on the deck. There is no satisfactory evidence that Elwell refused to obey the captain when he ordered him forward, but it is without doubt that his obedience was surly and reluctant. When he was prostrated by the last blow, the captain called out to confine him, and as soon as, or before he had fairly got upon his feet, he was seized by the captain and both mates, cast down again on deck, and lashed either to the boat or to a spare topmast that was lying on deck. He remained here, lying with his legs over the topmast and his body on the deck, for about an hour, when he was released by Storer, and went below. After he was thrown down the second time, he cried out that his arm was broke, and during the whole time that he lay on deck he continued holding the wrist of his lame arm in his right hand, to utter loud and piercing cries that his arm was broken, intermingled with oaths, and occasionally singing parts of songs. Once or more he asked some of the crew if they could see a shipmate lying thus, with a broken arm, and not relieve him. He told the captain that his wages were damned for breaking his arm, and that it would cost more than he was worth to pay for the injury. There was no examination until after he went below, to ascertain the reality of the injury. After that, it was examined by the master and others of the crew, and it was concluded that the arm was not broken, but merely sprained, and emollients were directed to be applied, to soothe the pain. On his return to Portland, fourteen days after the injury, he applied for surgical assistance. On examination, it was found that the left shoulder was dislocated, the luxation being downward and forward, and the head of the os humeri being protruded forward under the pectoral muscle. It was reduced with difficulty, and with great pain to the patient. It is stated by the surgeon that it will be some months, two or three at least, before he can recover the use of his arm, in consequence of the time that elapsed before it was reduced, and that he may always remain more liable to a like injury, than if no luxation had taken place.

There is a suggestion in each of the answers, that there was an apprehension of mutiny, and some causes are assigned for the apprehension. They do not appear to be such as would seriously disturb the mind of a firm and resolute man, and I feel bound to say, that if any such apprehensions were felt at the time, they have not been sustained by anything like proof on the trial, but that the whole of the evidence most decisively negatives any such idea. The entry on the log-book, of June 26, nautical time, is, "Robert Elwell mutinied by coming aft with an open knife, swearing that he would cut the throats of the officers, unless he got rum, clenching the second mate, and striking at him with a stick of wood. So we lashed him to the deck." And on the following day there is another entry: "Robert Elwell was put off duty on account of his depredations," an expression, as applied to this case, which I confess I do not comprehend. No complaint was made of Elwell during the voyage, but

at this time, except that one of the witnesses stated that once before he had been intoxicated, and probably on the same day there is this entry in the log, "Robert Elwell for misbehavior;". and except, also, that he was not so good a seaman as he shipped for. At the same time, it is but justice to add that the testimony of the witnesses places the master entirely free from any suspicion of habitual severity. Such, in substance, are the facts, as nearly as I can elicit them from the somewhat contradictory statements of the witnesses, both of the injury and the justification. It is not too much to say, that the feelings of the witnesses on both sides have given a coloring to their testimony, which should make us cautious of admitting all their representations without some grains of allowance.

The affray commenced between Elwell and the second mate, Fales. When Elwell, after his grog was refused, continued to demand it, and refused to go forward on his order, Fales took upon himself to chastise him for his insolence and disobedience. That Fales was correct in refusing to deliver the customary allowance of grog, is admitted. It seems to have been in conformity with the orders of the captain. But it is not equally clear that he is as fully justifiable in assuming to himself the authority of inflicting corporal chastisement on the man for his disobedience, when the captain was at his elbow. It was not a case where the safety of the vessel or the discipline of the crew required the instant exertion of such authority. And it may be here remarked, that though the law does indeed justify the master in chastising on the spot a reluctant or disobedient seaman, I am not aware that this authority is extended to his subordinate officers, when he is present, especially to the lowest on board the vessel. Such things often, without doubt, are done, and pass off, and if the punishments are merited and not unreasonably severe, I do not say that courts will give much encouragement to a seaman who should ask for damages. But I am now inquiring for the legal rights of the subordinate officers in the presence of the captain, and I am free to say that I do not know the law which in such cases invests the inferior officer with such powers. The ancient sea-laws are curiously directory in fixing the limitations of this authority in the captain, and the authority itself is, in some of them, rather suggested than directly given. Consulat de la Mer. c. 165; Laws Oleron, art. 12; Cleirac, p. 48; Laws Wisbuy, art. 24; Ordinance de la Marine, bk. 2, tit. 1, art. 22; 1 Val. 447. But there is not, within my recollection, an intimation that any such authority is intrusted to the inferior officers of the ship. I am by no means satisfied that the interests of commerce, the security of navigation, or the good discipline of ships' crews require it. On the contrary, it seems to me that such a distribution and extension of power would be the parent of confusion rather than order, and by breaking in upon the unity of authority, would tend rather to the relaxing than the sustaining of good discipline. To me it seems that a good shipmaster should allow no person but himself to inflict a blow on a seaman, in his presence.

If such be the law, it takes some shades from the misconduct of Elwell in the scuffle which took place between him and Fales. It does not excuse him from persevering in the demand of his grog, after it had been refused; much less does it excuse his insolence and disobedience to his superior. If he was aggrieved, his appeal lay to the master. But he was probably conscious of the propriety of the officer's conduct, and well satisfied that the refusal of Fales would be confirmed by the captain. It, however, places Mr. Fales, when he commenced the assault, in the legal attitude of the aggressor. When Storer came up and parted the combatants, he was merely in the execution of his official duty, but the libellant added to the aggravation of his previous misbehavior the refusal to obey the proper and just order of this officer. When the affray commenced, the captain was in the cabin. He was called up by the noise on deck, and asked if there was mutiny, to which one of the officers replied that it looked like it. This was the only inquiry he made into the cause or nature of the quarrel. But as he was within hearing during the whole, he may well be supposed to have understood the origin and character of the affray. He proceeded to punish the delinquent on the spot.

It is not difficult to state, in general terms, the nature and extent of the master's authority in such cases. It is his duty to preserve discipline on board his ship, and it is his right to correct the disobedience or insolence of a seaman by moderate chastisement, his authority in this respect being analogous to that of a parent over his children, or a master over his apprentice. Abb. Shipp. (Am. Ed.) 187; 1 Valin, Comm. 447. But though there is little difficulty in stating the right of the master in general terms, it is not so easy in practice to fix the precise point at which a just and wholesome exercise of domestic discipline passes into a criminal abuse of power. In such cases, I am not insensible that the condition of the captain is to be looked upon with indulgence. The occasion that calls into activity his authority, usually requires that it should be exercised with promptitude, often under circumstances of strong excitement, with but little time for reflection, and little opportunity of weighing in critical scales the just amount of punishment against the magnitude of the offence. Something, under such circumstances, is to be indulged in his favor, to the infirmity of human nature. To hold him responsible for what another person, who looked on as a cool and unconcerned spectator, might think a moderate excess, would be trying his conduct by too severe a test; it would give too

much encouragement to not the best class of mariners to enter prosecutions for trivial injuries, and have a tendency to break down all authority and discipline. It was very justly urged by the libellant that the greatest discretion is not to be expected from the humble condition of a common sailor, but that the usefulness of the class to which he belongs, his hard services, and small reward, and the character of frankness, and thoughtless intrepidity which seems to be naturally created by the nature of his employment, justly require that we should look on his failings with sentiments of kindness and not severity. To this argument it may be replied, with equal truth, that when the misbehavior of the seaman has called into action the correctional power of the master, the like reasons claim for him a like indulgence of judgment in favor of the necessary exercise of discretionary authority.

In the present case, there was misbehavior on the part of the libellant that unquestionably justified correction, and the true question is, whether in inflicting summary justice, the officers have passed the limits beyond which the indulgence of the law cannot, consistently with justice and sound policy, follow them. In my opinion they have. It has been argued for the respondents that the master, under the circumstances, having the right to chastise Elwell, that the mode of punishment being a legal and proper one, and the dislocation of a limb not being intended nor likely to occur in the mode of correction adopted, the officers ought not to be holden responsible for an accidental and unexpected injury. There is certainly a great degree of plausibility in this mode of considering the case. But will the facts warrant it? When the master, in this way, takes his stand upon his strict legal rights, I must be permitted to say that he showed, as is perhaps too apt to be the case, quite as much alacrity as was suitable, in resorting to severe measures. From all the evidence, the dislocation seems to have been effected when Elwell was thrown down to be lashed. The master and both mates had then hold of him, and assisted in lashing him down and making him fast. With such odds as the strength of three against one, it would seem that with ordinary caution in the application of their force, Elwell might have been secured without the employment of such violence as must have been exercised to produce the injury he sustained. That degree of violence was unnecessary and unwarrantable, and if an injury was done beyond what was intended, though as happening partly from misadventure, it may not call for vindictive, no reason is perceived why the authors of it should not be holden answerable for actual pecuniary damages, as the expense of cure and loss of time occasioned by the injury. Under all the circumstances, to this amount I think the damages ought to be limited.

It is contended on the part of the respond-ents' counsel, that whatever may be the decision as to the master, Storer and Eales, who acted in obedience to his order, can in no event be held responsible. They would, indeed, be justified in confining Elwell, and this was the extent of the master's order. But in executing it, if a serious injury was inflicted, from their unnecessary harshness or want of caution, they must be held to answer for it. They were jointly engaged in doing the wrong, and I do not perceive any reason why they should not be jointly held to respond the damages. Decree, $80 damages, and costs.